## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL SAIDOCK,
     Plaintiff,

No. 3:19-cv-1319 (SRU)

     v.

TANESHA CARRINGTON-MCCLAIN,
et al.,
     Defendants.

## <u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

On August 27, 2019, Daniel Saidock ("Saidock"), a now released state prisoner,[1] brought

a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against four Connecticut

Department of Correction ("DOC") employees: Nurse Tanesha Carrington-McClain ("Nurse

Carrington-McClain or Tanesha"), Dr. Vicki Blumberg ("Dr. Blumberg"), Dr. Susannah Tung,

and Dr. George L. Bozzi. *See* Compl., Doc No. 1, at 2. Saidock alleges that, while he was a

pretrial detainee at Bridgeport Correctional Center ("BCC"), those four defendants displayed

deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment.

On November 24, 2020, the only remaining defendants in the case[2], Nurse Carrington-

McClain and Dr. Blumberg (together, the "Defendants"), filed the instant motion for summary

judgment. *See* Defs. Mot. for Summ. J., Doc. No. 38; Defs. Mem. in Supp. Mot. for Summ. J.,

Doc. No. 38-1 ("Defs. Mem"). The deadline to file an opposition came and went with no filing

by Saidock. On January 25, 2021, I issued an order advising Saidock that if he did not file an

---

[1]     *See* Notice, Doc. No. 28 (notifying the court, on May 7, 2020, that Saidock had moved to a halfway house);
Notice, Doc. No. 35 (notifying the court, on November 12, 2020, that Saidock had moved again).

[2]     I received this case in January 2021. The case was originally assigned to District Judge Kari A. Dooley,
who issued the Initial Review Order, doc. no. 8, and granted in part, and denied in part, the defendants' motion to
dismiss. Doc. No. 30. In September 2020, this case was transferred to District Judge Dominic J. Squatrito. *See* Order
of Transfer, Doc. No. 32. After Judge Squatrito died, the case was transferred to me. *See* Order of Transfer, Doc.
No. 45.

opposition, the Defendants' motion would be granted as unopposed. *See* Order, Doc. No. 46. Saidock, then, filed a motion for an extension of time, doc. no. 48, and I afforded him an additional 60 days to file an opposition. Order, Doc. No. 49.

Two months later, Saidock filed a second motion for an extension of time. *See* Mot. for Ext. of Time and Appoint. of Counsel, Doc. No. 50. In that motion, Saidock requested an additional six months to file an opposition to the Defendants' motion for summary judgment because he was experiencing housing insecurity and had been in ill health (often bedridden) following his release from prison. *Id.* Saidock also mentioned that he "really need[ed] a lawyer appointed to help" because his medical issues made him "unable to function fully." *Id.* His motion was granted, and I appointed counsel. Order, Doc. No. 51. After nine attempts[3], *see* doc. nos. 52, 56, 63, 66, 73, 77, 82, 85, 89, counsel was finally appointed in February 2022. Doc. No. 91. An opposition was filed on August 1, 2022. *See* Pl. Obj. to Mot. for. Summ. J, Doc. No. 101; Pl. Mem. in Supp. of Obj., Doc. Do. 101-1 ("Pl. Obj. Mem."). I held oral argument on the motion on September 22, 2022. *See* Min. Entry, Doc. No. 105.

For the reasons that follow, the Defendants' motion for summary judgment, doc. no. 38, is **granted**.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment).

---

[3]    Before current counsel for Saidock appeared, nine other attorneys were appointed but had to withdraw for various reasons.

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.     FACTUAL BACKGROUND

### A.     Clinical Record

On September 9, 2016, Saidock was admitted to the custody of the Connecticut Department of Correction. *See* Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 1. Several days later, on September 12, 2016, Dr. Blumberg examined Saidock. *Id.* at ¶ 2. Dr. Blumberg has been a physician for over 35 years. Defs. Ex. B, Doc. No. 38-3, at ¶ 4. She currently serves as the Principal Physician at BCC. *Id.* at ¶ 6.

Dr. Blumberg's examination revealed that Saidock was underweight, at 115 lbs., with a Body Mass Index ("BMI") of 16.5. *See* Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 3. During the examination, Saidock provided an overview of his medical history and current ailments, which revealed that Saidock has intestinal and bowel issues that affect his diet. *See* Defs. Ex. A, Doc. No. 43, at 714–715. Of significance, in 2012 he had a total colectomy (i.e., removal of colon), and a J-pouch procedure (i.e, a surgery performed after a colectomy) in 2014. *Id.* During this visit, Saidock indicated that "he has trouble digesting the food here" and stated Ensure "bothers him because of the milk." *Id.* In response, Dr. Blumberg prescribed lactase to aid with the digestion of lactose, one can of Ensure three times a day to help him gain weight, Lomotil as

needed for loose stool, Neurontin to address his pain, a bottom bunk pass, and ointment for his rectal area. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 4. Additionally, Dr. Blumberg obtained releases of information for Yale New Haven Hospital and Stamford Hospital to have a better understanding of his treatment history. *Id.*

Less than a month later, on October 6, 2016, Saidock met with a registered nurse and requested to be placed on a low residue diet, or high protein diet. *See* Defs. Ex. A, Doc. No. 43, at 712–13. His request was recorded on a document entitled "Patient Encounter/Nurse Sick Call." *Id.* That record states that the matter was referred to a medical doctor, though it does not specify which doctor on the document. *Id.* Days later, on October 11, 2016, Dr. Blumberg ordered a high calorie, high protein diet to help Saidock with weight gain, increase his energy level, and improve his nutritional intake to promote healing. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 5.

Dr. Blumberg met with Saidock on October 17, 2016. *See id.* at ¶ 6; Defs. Ex. A, Doc. No. 43, at 714. Saidock expressed concerns about eye irritation. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 6. Dr. Blumberg examined his eyes, noted conjunctivitis in his right eye and prescribed eye drops. *Id.* During this same visit, Saidock expressed a desire to travel by "special transport" due to bowel issues. *Id.* at ¶ 8. Special Central Transportation Unit (CTU) services are limited and designed for exceptional circumstances. *Id.* at ¶ 9. Dr. Blumberg did not believe that Saidock warranted special CTU transportation. *Id.* Nor was there any indication in Saidock's record that his medical condition precluded him from standard transportation. *Id.* at ¶ 11; Defs. Ex. B, Doc. No. 38-3, at ¶ 27. On October 25, 2016, Dr. Blumberg decreased the amount of Ensure prescribed to Saidock from three cans a day to two cans a day. Defs. Ex. B, Doc. No. 38-3, at ¶ 28.

Dr. Blumberg again met with Saidock on November 1, 2016. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 12. This time, he complained of abdominal pain and swelling. *Id.* His abdomen was tender to the touch. *Id.* Dr. Blumberg was concerned about the possibility of an acute infection and ordered Saidock transported to John Dempsey Hospital in Connecticut. Dr. Blumberg ordered CTU transport based on the urgency. *Id.* Saidock returned to BCC on November 10, 2016, and was placed in the infirmary. *Id.* at ¶ 13.

Saidock continued to be monitored by medical staff. *Id.* at ¶ 14; Defs. Ex. A, Doc. No. 43, at 703–05. Aside from his initial complaint in October 2016, there is no indication that Saidock requested a different diet or experienced problems with the high calorie/high protein diet he was prescribed. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 14. Between November 11, 2016 and November 14, 2016, there are multiple entries from different medical staff that state Saidock had no complaints. *Id.* at ¶ 17.

Another physician, Dr. Elderkin, examined Saidock on November 14, 2016. *Id.* at ¶ 18. Saidock reported no complaints during that visit. *Id.* Dr. Elderkin ordered a high calorie, high protein diet. *Id.*

Three days later, Dr. Blumberg met with Saidock. *Id.* at ¶ 19. He had slight swelling but reported no pain. *Id.* Dr. Blumberg reviewed the vital signs taken by the nurse. *Id.* She examined Saidock and noted the status of his abdomen. *Id.* Dr. Blumberg renewed the order for Ensure, extended the prescription for bacitracin ointment and discontinued the A&D ointment. *Id.* This was their last interaction in 2016.[4] *Id.*

---

[4]     Saidock asserts that during this appointment, he "again informed [Dr. Blumberg] that he cannot tolerate [E]nsure, and require[s] a low residue diet." Pl. Stmt. of Facts, Doc. No. 101-2, at 7. There is no evidence in the record to support that claim, nor does Saidock provide a citation in the record that would support that claim.

Saidock was scheduled to have an off-site follow-up appointment with general surgery on December 6, 2016. Defs. Ex. A, Doc. No. 43, at 702. He refused that medical service because of "to[o] much pain on [the transportation bus] due to [his] intestinal issues." *Id.*

In January 2017, Saidock was seen by medical staff in relation to a skin issue. *Id.* at 699–700. The medical encounter was memorialized on a document entitled "Patient Encounter/Nurse Sick Call." *Id.* At that time, no gastrointestinal issues were reported. *Id.* A month later, Saidock was seen again by medical staff. *Id.* at 696–97. Similarly, the medical encounter was recorded on a document entitled "Patient Encounter/Nurse Sick Call." *Id.* From the last visit in January 2017, he lost 6 pounds (151 pounds to 145 pounds) and reported having constant diarrhea. *Id.* Bowel sounds were positive in all four quadrants. *Id.* at 696. His appetite was described as "fair." *Id.* In addition, he expressed dissatisfaction with Lotomil prescription. *Id.* at 698.

On March 5, 2017, Saidock reported having stomach issues and expressed "chronic discomfort from having bowel removal." *Id.* at 695. Shortly thereafter, Dr. Blumberg examined Saidock. *Id.* at 693. For a three-week period in March 2017, Dr. Blumberg examined Saidock weekly. *Id.* During those visits, he did not mention concerns about either his diet or CTU services. *Id.*; Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 20.

From that last visit until May 2017, Saidock continued to be treated by medical staff for unrelated issues. Defs. Ex. A, Doc. No. 43, at 687–692. None of records from those visits reflect any discomfort with his diet. *Id.* On May 22, 2017, Dr. Blumberg met with Saidock. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 21. There was no mention of either a low residue diet. *Id.* She did, however, increase his gabapentin to alleviate his pain. *Id.*

Dr. Blumberg did not see Saidock again until November 16, 2017. *Id.* at ¶ 23. At that time, it was apparent the high calorie, high protein diet was effective. *Id.* His weight increased from 115 pounds with a BMI of 16.5 in 2016 to 160 pounds with a BMI of 23.7. *Id.*

Throughout 2018, Saidock continued to be treated by Dr. Blumberg. *Id.* at ¶ 24. Saidock did continue to experience medical issues, including frequent bathroom use. *See* Defs. Ex. A, Doc. No. 43, at 653. At one point, Dr. Blumberg changed Saidock's diet to dairy-free under the mistaken assumption that he was lactose intolerant. *Id.* at 650, 652. Saidock objected to the change, noting "I never said I have a problem with dairy. Please stop the no dairy diet." *Id.* at 635. The next day, Dr. Blumberg corrected the error, and the standard diet was resumed. *Id.* at 633. No other complaints about his diet are reflected in the record.

On March 21, 2019, Dr. Blumberg placed Saidock on a low residue diet. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 26. On September 26, 2019, Saidock was seen by Dr. Blumberg. Defs. Ex. A, Doc. No. 43, at 164–66. During that visit, Saidock stated that his diet has taken time to "get right" but he is "good with the diet here now." Defs. Ex. A, Doc. No. 43, at 165.

B.    Administrative Files

1)    *Request for Low Residue Diet*

On November 17, 2018, Saidock submitted an inmate request form to medical and Nurse Carrington-McClain, requesting a low residue diet because the foods he was eating were causing him more pain. Pl. Ex. 1, Doc. No. 101-3.

On January 18, 2019, Saidock submitted a second inmate request form to medical and Dr. Blumberg requesting to see Dr. Blumberg because he "needs a low residue diet [and] increase of [L]omotil." Pl. Ex. 2, Doc. No. 101-3.

On February 24, 2019, Saidock submitted two inmate request forms directed to the kitchen supervisor requesting a "low residue diet," and describes having a medical condition where he cannot digest certain foods. Pl. Ex. 3, Doc. No. 101-3; Pl. Ex. 4, Doc. No. 101-3.

On April 23, 2019, Saidock submitted another inmate request form directed to medical, Nurse Carrington-McClain, and Dr. Blumberg. Pl. Ex.14, Doc. No. 101-3. He states that he is still being sent foods that he cannot digest and mentions that his file notes that he has a fish allergy. *Id.*

### 2)   *Request for CTU Transport*

On January 18, 2019, Saidock submitted an inmate request form stating that he "needs a special CTU ride to court" due to his medical conditions. Pl. Ex. 10, Doc. No. 101-3.

On February 23, 2019, Saidock submitted two inmate request forms specifically requesting that a CTU ride be set up for his court date on March 6. Pl. Ex. 11, Doc. No. 101-3; Pl. Ex. 12, Doc. No. 101-3.

On March 3, 2019, Saidock submitted another inmate request form requesting that a CTU ride be set up for court or any other trips for long periods of time. Pl. Ex. 13, Doc. No. 101-3.

On April 23, 2019, Saidock submitted another inmate request form requesting that CTU transport be set up for his two upcoming court visits on May 16 and June 4. He states that he cannot be without access to a toilet for hours. Pl. Ex. 14, Doc. No. 101-3.

On May 5, 2019, Saidock submitted another inmate request form describing his colon condition and why that condition requires access to a toilet on long car rides. Pl. Ex. 15, Doc. No. 101-3.

## III.    DISCUSSION

On November 24, 2020, the Defendants filed a motion for summary judgment on

Saidock's remaining claims, which were against: (1) Dr. Blumberg for failure to provide Saidock

with a low residue diet; and (2) Dr. Blumberg and Nurse Carrington-McClain for failure to

provide Saidock with CTU transportation. Doc. No. 38. In their motion for summary judgment,

the Defendants argue that (1) Saidock has failed to exhaust his administrative remedies, (2)

Saidock cannot prevail on the merits, and (3) in any event, the Defendants are entitled to

qualified immunity. *See* Defs. Mem., Doc. No. 38-1, at 7–21.

    A.    <u>Exhaustion</u>

        *1.*    *Relevant Law*

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust available

administrative remedies before filing a federal lawsuit regarding prison conditions. *See* 42 U.S.C.

§ 1997e(a). Section 1997e(a) applies to all claims regarding prison life, *Porter v. Nussle*, 534

U.S. 516, 532 (2002), and it requires exhaustion of any available administrative remedies,

regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S.

731, 741 (2001). A claim is not exhausted until the inmate complies with all administrative

deadlines and procedures. *See Woodford v. Ng*o, 548 U.S. 81, 90 (2006); *see also Amador v.

Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the

[government] agency holds out and doing so properly"). A prisoner who does not complete the

exhaustion process until after filing a federal lawsuit has not satisfied the exhaustion

requirement. *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after

suit is filed therefore is insufficient."); *Gulley v. Bujnicki*, 2019 WL 2603536, at *3 (D. Conn.

June 25, 2019).

The exhaustion requirement, however, may be excused when a remedy is not available in practice even if it is "officially on the books." *Ross v. Blake*, 578 U.S. 632, 643 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S. at 738). The United States Supreme Court has established three kinds of circumstances in which an administrative remedy might be unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Exhaustion of administrative remedies is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). As such, the Defendants "bear the burden of proving that the plaintiff did not exhaust his administrative remedies[.]" *Guarneri v. West*, 782 F. Supp. 2d 51, 59 (W.D.N.Y. 2011) (cleaned up).

2.    *Analysis*

a)    Administrative Directive Procedure

Administrative Directive 8.9 ("Directive 8.9") governs the administrative remedies for health services at Connecticut DOC facilities.[5] Directive 8.9 provides for two types of Health

---

[5]    The Defendants have submitted the relevant version of Administrative Directive as Exhibit D, Doc. No. 38-5 ("Directive 8.9").

Services Review ("HSR"); first, "Diagnosis and Treatment," which includes a decision not to provide treatment, and second, "Review of an Administrative Issue," which addresses concerns regarding "a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." Directive 8.9 (9).

Both types of HSRs require an inmate to "seek an informal resolution prior to filing for a [HSR]." *Id.* at 8.9 (10). That informal resolution attempt must occur either "face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form." *Id.* If an inmate pursues the written option, a DOC official must respond within 15 calendar days. *Id.*

When an inmate seeks review of a diagnosis or treatment, the following procedure applies. If informal resolution is "unsuccessful," an inmate "may apply for" a HSR by: "utilizing [a] CN 9602 Inmate Administrative Remedy form," "check[ing] the 'Diagnosis/Treatment' box," "explain[ing] concisely the cause of his/her dissatisfaction," and "deposit[ing] the completed form in the Health Services Remedies/Review box." *Id.* at 8.9 (11). Upon receipt of a CN 9602, the HSR coordinator must schedule a HSR appointment with the appropriate health care provider (e.g., physician, dentist, or psychologist/psychiatrist). *Id.* at 8.9 (11)(A). If the health care provider decides that the existing diagnosis or treatment is appropriate, "the inmate shall have exhausted the" HSR process. *Id.* In that case, the health care provider must notify the inmate of the decision, in writing, within 10 business days by indicating "No Further Action" in the disposition field of the relevant CN 9602. *Id.* On the other hand, if the health care provider "decides that a different diagnosis or treatment is warranted," the health care provider "may either (1) act on his/her decision; or, (2) refer the case to the Utilization Review Committee for

authorization by indicating 'Change of Treatment' or 'Referred to URC' as appropriate, in the disposition field of CN 9602." *Id.* at 8.9 (11)(B).

> b) Application

It is undisputed that Saidock was required to comply with the grievance procedures set forth in Directive 8.9. From the Defendants' perspective, Saidock did not because he did not file an HSR to address his diet or request for CTU transportation. In fact, the Defendants posit that Saidock only filed one HSR, and that HSR, dated July 29, 2019, related to dental treatment and was ultimately withdrawn. Defs. Stmt. of Facts, Doc. No. 38-2, at ¶ 40. Moreover, the Defendants' records do not show that an HSR appointment was scheduled. *Id.* at ¶ 41.

Saidock, on the other hand, has produced several documents that call into question the Defendants' version of facts. Per Directive 8.9, Saidock was first required to seek an informal resolution by either a face-to-face interaction or using a CN 9601 form. Included in the record are **five** inmate request forms with respect to the diet issue.

- <u>Exhibit 1</u>: Inmate Request Form CN 9601, dated November 17, 2018, in which Saidock names "Nurse Tanesha" and "medical."

    o Therein, Saidock requests that someone look into whether a "low residue" diet is available because the foods he is eating is causing him more pain. Pl. Ex. 1, Doc. No. 101-3.

- <u>Exhibit 2</u>: Inmate Request Form CN 9601, dated January 18, 2019, in which Saidock names "medical" and "Dr. Blumberg."

    o Therein, Saidock requests to see Dr. Blumberg because he "need[s] a low residue diet [and] increase of [L]omotil." Pl. Ex. 2, Doc. No. 101-3.

- <u>Exhibits 3 & 4</u>[6]: Inmate Request Form CN 9601, both dated February 24, 2019, in which Saidock names "kitchen supervisor."

---

[6]    In Exhibit 4, it appears that someone responded to Saidock, alerting him that his request would need to be referred to medical.

- o   Therein, Saidock states that he needs a "low residue diet," and describes having a medical condition where he cannot digest certain foods. Pl. Ex. 3, Doc. No. 101-3; Pl. Ex. 4, Doc. No. 101-3.

- Exhibit 7, Inmate Request Form CN 9601, dated April 23, 2019, in which Saidock names "medical," "Tanesha," and "Dr. Blumberg."

  - o   Therein, Saidock states that he is still being sent foods that he cannot digest and states that his file mentions that he has a fish allergy. Pl. Ex. 7, Doc. No. 101-3.

With respect to the CTU transport issue, the record includes **six** inmate request forms.

- Exhibit 10, Inmate Request Form CN 9601, dated January 18, 2019, in which Saidock names "medical," "Tanesha," and "Dr. Blumberg."

  - o   Therein, Saidock states that he "needs a special CTU ride to court" due to his medical conditions. Pl. Ex. 10, Doc. No. 101-3.

- Exhibit 11, Inmate Request Form CN 9601, dated February 23, 2019, in which Saidock names "medical" and "Dr. Blumberg."

  - o   Therein, Saidock specifically requests that a CTU ride be set up for his court date on March 6. Pl. Ex. 11, Doc. No. 101-3. He states that he cannot sit in a truck all day without access to a toilet. *Id.*

- Exhibit 12, Inmate Request Form CN 9601, dated February 23, 2019, in which Saidock names "medical" and "Tanesha."

  - o   Therein, Saidock specifically requests that a CTU ride be set up for his court date on March 6. Pl. Ex. 12, Doc. No. 101-3. He states that he cannot sit in a truck all day without access to a toilet. *Id.*

- Exhibit 13: Inmate Request Form CN 9601, dated March 3, 2019, in which Saidock names the "Warden."

  - o   Therein, Saidock requests that a CTU ride be set up for court or any other trips for long periods of time. Pl. Ex. 13, Doc. No. 101-3.

- Exhibit 14: Inmate Request Form CN 9601, dated April 23, 2019, in which Saidock names "medical," "Tanesha," and "Dr. Blumberg."

  - o   Therein, Saidock requests that CTU transport be set up for his two upcoming court visits on May 16 and June 4. Pl. Ex. 14, Doc. No. 101-3. He states that he cannot be without access to a toilet for hours. *Id.*

- <u>Exhibit 15</u>, Inmate Request Form CN 9601, dated May 5, 2019, in which Saidock names the "Warden."

    o Therein, Saidock describes his colon condition and why that condition requires that he has access to a toilet on long car rides. Pl. Ex. 15, Doc. No. 101-3. He requests that CTU transport be arranged for his court dates on May 16, and June 4. *Id.*

Those various inmate request forms should have triggered a response from a DOC official.

Based on the record, however, the forms did not. Per Directive 8.9, Saidock, being "dissatisfied

with a … treatment that pertains to him," and having had an "unsuccessful" result from the

informal review process, was entitled to file an HSR. *Id.* at 8.9 (11). And he did.

- <u>Exhibit 5</u>, HSR Form, CN 9602, dated March 12, 2019

    o Therein, Saidock seeks a HSR of Dr. Blumberg's failure to issue a low residue diet. Pl. Ex. 5, Doc. No. 101-3.

        ▪ Saidock checked the box in Section B, indicating that he was requesting a HSR for "Diagnosis/Treatment." *Id.*

        ▪ In Section 4, under the directions to "[p]rovide any factual information that is applicable, including any responses from staff[,]" Saidock stated, *inter alia*, "[t]his is against Dr. Blumberg for denying me a special medical diet which my medical condition requires. Eating regular food causes me pain [and] suffering. Dr. Blumberg knows this [and] still [denies] me proper medical attention." *Id.* He also states that he had filed an inmate request but it had not been responded to within fifteen days and that he requested that Dr. Blumberg order a low residue medical diet. *Id.*

- <u>Exhibit 8</u>, HSR Form, CN 9602, dated May 15, 2019

    o Therein, Saidock seeks a HSR of the kitchen's continued act of sending Saidock food—specifically fish—that he cannot eat. Pl. Ex. 8, Doc. No. 101-3.

        ▪ Saidock checked the box in Section B, indicating that he was requesting a HSR for "Diagnosis/Treatment." *Id.*

- <u>Exhibit 16</u>, HSR Form, CN 9602, dated May 22, 2019

    o Therein, Saidock states that he wrote a request to both Dr. Blumberg and Tanesha requesting CTU transport for two court proceedings on June 4 and July 3. Pl. Ex. 16, Doc. No. 101-3.

- ▪ Saidock checked the box in Section B, indicating that he was requesting a HSR for "Diagnosis/Treatment." *Id.*

- ▪ In Section 4, under the directions to "[p]rovide any factual information that is applicable, including any responses from staff[,]" Saidock stated, *inter alia*, he was "stuck for over [an] hour on the marshal truck," and forced to have liquid stool leak out on himself on his way to his court proceeding on May 16 because neither Dr. Blumberg or Tanesha responded to his prior inmate requests for a CTU transport. *Id.*

Upon receipt of those HSRs, the HSR Coordinator must schedule an appointment with an appropriate health care provider. It is undisputed that Saidock never received an appointment for any of the above HSRs. Either of two things happened: (1) Saidock failed to complete the final step, which is dropping the HSR forms off in the Health Services Remedies/Review box; or (2) Saidock did drop off the HSR forms, but for some reason out of Saidock's control, an appointment was never scheduled. Regardless, the record does not provide a clear picture regarding what happened. If it is the first option, then the Defendants are correct in that Saidock failed to exhaust his administrative remedies. But if the second option is what happened, Saidock's ability to participate in the process was effectively frustrated. Moreover, Directive 8.9 does not lay out the procedure for what occurs if a HSR is never scheduled, so there was effectively nothing for Saidock to do but file the instant lawsuit.

The Defendants bear the burden of proving exhaustion. They have not carried that burden here. Construing the evidence in the light most favorable to Saidock, the nonmoving party, I conclude that genuine issues of material fact exist regarding whether Saidock exhausted his administrative remedies and whether, even if he did not, those administrative remedies were available to him. Accordingly, I reject the Defendants' argument for summary judgment on the basis of non-exhaustion because of the existence of a genuine issue of fact.

B.    <u>Deliberate Indifference Claims</u>

16

Prisoners' and pretrial detainees' constitutional claims are analyzed under different standards. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Deliberate indifference claims of convicted inmates[7] are considered under the Cruel and Unusual Punishments Clause of the Eighth Amendment, whereas claims of pretrial detainees are considered under the Due Process Clause of the Fourteenth Amendment. *Id.* Accordingly, I begin by first determining Saidock's legal status.

The events underlying this lawsuit commenced in September 2016 and ceased with the filing of the lawsuit on August 27, 2019. During that time period, Saidock's status changed from pretrial detainee to convicted felon on July 9, 2019.[8] The parties have chosen not to address this point, contending that Saidock, at "all relevant times," was a pretrial detainee. *See* Defs. Mem., Doc. No. 38-1, at 10; Pl. Obj. Mem., Doc. No. 101-1, at 17. The relevant period, however, is not precisely defined, particularly with respect to Saidock's denial of special transport claim. Nonetheless, Saidock's status is of no moment because, for reasons described herein, Saidock fails to prove a necessary element for both the Eighth and Fourteenth Amendments claims.

      1.      Deliberate Indifference Standards

---

[7]      In the Second Circuit, the constitutional status of defendants convicted, but not sentenced, remains unsettled. *See Oneil v. Rodriguez*, 2020 WL 5820548, at *2 n.2 (E.D.N.Y. Sept. 30, 2020). Nonetheless, a majority of courts have concluded that a post-conviction, pre-sentencing inmate is not a pretrial detainee, and is protected by the Eighth Amendment. *Stewart v. Schiro*, 2015 WL 1854198, at *11 (E.D.N.Y. Apr. 22, 2015) (agreeing with the "weight of authority" that an individual "who at the time of the alleged constitutional deprivation was awaiting sentencing after pleading guilty to a crime and after being convicted upon such a plea" is not a "pretrial detainee."); *see also Berry v. Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) ("The critical juncture is conviction, … at which point the state acquires the power to punish and the Eighth Amendment is implicated.").

[8]      Public records show that Saidock was arrested on September 8, 2016. He pled guilty on July 9, 2019 and was sentenced on September 18, 2019. *See* State of Connecticut Judicial Branch, Criminal /Motor Vehicle Convictions Search by Defendant, https://www.jud2.ct.gov/crdockets/SearchByDefDisp.aspx (last accessed Sept. 30, 2022). At oral argument, counsel confirmed the accuracy of those dates. As a technical matter, any claims that arise on or after July 9, 2019 should be analyzed under the Eighth Amendment.

The standard under the Due Process Clause is similar in this context to that under the Eighth Amendment, requiring the inmate to first satisfy "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of [constitutional rights]." *Fenton v. Provow*, 2022 WL 3904110, at *3 (N.D.N.Y. Aug. 5, 2022) (quoting *Darnell*, 849 F.3d at 29); *see also White v. City of New York*, 2017 WL 3575700, at *3 (S.D.N.Y. Aug. 17, 2017) ("The objective prong is the same regardless of whether the plaintiff is a pretrial detainee or a prisoner."). To do so, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, … which includes the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 30 (cleaned up). In making that evaluation, "[t]here is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" *Id.* at 30 (citing *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)).

Second, Saidock must satisfy the "'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. Although the Eighth Amendment requires actual knowledge to satisfy the "*mens rea* prong," a pretrial detainee need only show that a defendant "should have known" of "an excessive risk to [inmate] health or safety." *Id.* at 29, 35 ("Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."). There can be no liability for negligently inflicted harm,

however. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015*) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

For the following reasons, the evidence in the record fails to give rise to a triable issue of fact that the conduct of the Defendants regarding both (1) Saidock's diet; or (2) the denial of special transport, created an unconstitutional condition of confinement.

2.      Denial of Low Residue Diet

An inmate does not have a right to a specialized diet while incarcerated. *See Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001). Under certain circumstances, however, "[t]he denial of a medically proscribed diet may constitute an Eighth Amendment[9] violation." *Abdush–Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996); *accord Robles v. Coughlin*, 725 F.2d 12, 15–16 (2d Cir. 1983) ("under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."). Such claims "must be reviewed under the more particularized standards applicable to such medical indifference claims." *Young v. Fricke*, 2018 WL 3121714, at *7 (N.D.N.Y. Feb. 12, 2018) (quoting *Mejia v. Goord*, 2005 WL 2179422, at *6 (N.D.N.Y. Aug. 16, 2005)).

Under the Second Circuit, the objective serious medical need inquiry is fact-specific and "must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Smith*, 316 F.3d at 185–86). If, as here, the inmate alleges that the medical treatment received was

---

[9]      The same is true under the Fourteenth Amendment. A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

inadequate, the inquiry is narrower. It becomes a question of "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [Fourteenth] Amendment purposes." *Smith*, 316 F.3d at 186.

Against that backdrop, "[t]o establish a valid claim that the denial of … a medically proscribed diet … constitutes [a Fourteenth Amendment] violation, one must establish that there was a sufficiently serious condition that resulted from the food not being received." *Gaines v. Armor Health Care, Inc.*, 2012 WL 5438931, at *5 (E.D.N.Y. Nov. 2, 2012) (quoting *Tafari v. Weinstock*, 2010 WL 3420424, at *7 (W.D.N.Y. Aug. 27, 2010)); *see also Johnson v. Harris*, 479 F. Supp. 333, 336–37 (S.D.N.Y. 1979) (finding violation of Eighth Amendment where officials continuously failed to provide a diabetic inmate with a medically appropriate diet, resulting in a decline in his health, including weight loss of 30 pounds). Here, the record is entirely devoid of such evidence.

It is not clear whether Saidock even *required* a low residue diet. Initially, Saidock alleged that a low residue diet is the "common diet for anyone with irritable bowel syndrome, ulcerative colitis, [Crohn's] dieses [and] total colectomy." Compl., Doc. No. 1, at ¶ 42.[10] And to his credit,

---

[10]     I cannot consider the allegations in Saidock's complaint as evidence because it is not verified, such that it can be treated as affidavit. An affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also Gill v. Frawley*, 2006 WL 1742738, at *4 (N.D.N.Y. June 22, 2006).
        Saidock's complaint states "the matters alleged therein are true, except as to those matters alleged on information and belief and as to those I believe them to be true." Compl., Doc. No. 1, at ¶ 21. There is no way for this Court to distinguish between allegations based on Saidock's personal belief and those based on his information and belief. Therefore, I do not consider it as evidence. *See Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir. 1988) ("[The defendant's] affidavit states that it is based on personal knowledge or upon information and belief.… Because there is no way to ascertain which portions of [the defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment.") (cleaned up).

the record establishes that he had a total colectomy. But the record is devoid of any expert testimony, clinical finding, or medical research from which a trier of fact could conclude that Saidock's medical condition necessitates a low residue diet. *See Pineida v. Lee*, 2014 WL 4802745, at *2 (N.D. Cal. Sept. 25, 2014) (noting that, "[the plaintiff] … *submitted evidence* that the food provided by [the prison] does not meet his dietary needs, as it contains many high fiber foods which, if consumed, would inflame the symptoms of his pouchitis and cause him severe pain.") (emphasis mine). Older medical records from 2014 suggest that Saidock was previously on a low residue diet. *See* Defs. Ex. A, Doc. No. 43, at 915 (noting that, Saidock was "finally returned to a low residue diet"). Even that record, however, fails to confirm that Saidock required that diet. Moreover, Saidock wholly fails to establish how the diet he received differs from a low residue diet.

Even assuming, *arguendo*, that a low residue diet is medically indicated for Saidock's medical conditions, Saidock has not set forth any evidence that a sufficiently serious condition resulted, or could have resulted, from not receiving that diet. In fact, the evidence shows quite the contrary. There are records showing that Saidock ate his meals without issue. *See, e.g.,* Defs. Ex. A, Doc. No. 43, at 704 (described as having "no complaints" and eating "100% of meal"). Even the one medical record that states Saidock "did not eat lunch," does not support his claim, as the reason for not eating was due to personal preference, not intolerance. *Id.* ("reports did not eat lunch [because] he did not like what was given"). Furthermore, Saidock's health improved on the high calorie, high protein diet, resulting in a 40-pound weight increase. The Court is sympathetic to Saidock's allegations that he "suffered greatly for 2 ½ years with extreme pain." Compl., Doc. No. 1, at ¶ 39. But the record simply does not support that allegation. To be fair, Saidock did report having other ailments, such as eye irritation, abdominal pain and diarrhea. But

those conditions were never attributed to his diet— not by him at the time of those complaints, or a medical professional.

Further undermining his claim, Saidock did not complain about his diet for over two years. Upon his arrival at BCC, Saidock promptly alerted medical staff that he required a low residue diet, or high protein diet. Defs. Ex. A, Doc. No. 43, at 712–13. His case was referred to Dr. Blumberg. On October 12, 2016, Dr. Blumberg prescribed a high calorie, high protein diet. After prescribing that diet, Dr. Blumberg continued to monitor Saidock. And it is undisputed that, until November 18, 2018, Saidock did not once alert prison officials that he could only tolerate a low residue diet. The sole instance when Saidock protested his diet was in relation to being placed on a diary-free diet, and within a day of his complaint, his diet was adjusted.

In the end, even if Dr. Blumberg was on notice that Saidock *potentially* required a low residue diet, the evidence does not support a conclusion that Saidock endured a serious condition that resulted from not receiving that diet. Because Saidock has failed to submit evidence from which a reasonable jury could find that he suffered a Fourteenth Amendment violation, his claim fails as a matter of law. Therefore, Dr. Blumberg is entitled to summary judgment on this claim.

3.      CTU Transport

As an initial matter, I disagree with the Defendants' characterization of Saidock's allegations. In their papers, the Defendants treat this claim as one sounding in the denial of adequate medical care. *See* Defs. Mem., Doc. No. 38-1, at 12 (arguing that Saidock has failed to show a serious medical need). But what Saidock challenges are conditions of his confinement— those being: (1) lack of toilet access on car rides; and (2) being forced to defecate on himself.[11] As such, I apply the standard applicable to condition-of-confinement claims.

---

[11]      To the extent that Saidock argues that he should have been given a reasonable accommodation under the Americans with Disabilities Act of 1990, that is not the claim before me.

The protections afforded by the Fourteenth Amendment include conditions of confinement which are "humane, though not necessarily comfortable." *Jabbar v. Fischer*, 683 F.3d 54, 58 (2d Cir. 2012) (cleaned up). Deprivation of toilet access, like any other deprivation, must be tested by the same Fourteenth Amendment analysis. In order to rise to the level of a constitutional violation, the deprivation must be sufficiently serious, and the defendants must have the requisite *mens rea*. *See Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *Darnell*, 849 F.3d at 29, 32.

To satisfy the objective component of the test, the court must consider the duration and intensity of the deprivation. "[O]ccasional and temporary deprivations of sanitary and temperate conditions, *without more,* do not constitute a sufficiently serious deprivation under the Eighth Amendment to constitute punishment." *Darnell*, 849 F.3d at 29, 32 (cleaned up); *see, e.g., Wang v. Vahldieck*, 2012 WL 119591, at *9 (E.D.N.Y. Jan. 9, 2012) ("[T]emporary or limited exposure to unsanitary conditions fails to state an injury of constitutional magnitude."); *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001) (noting factor to consider when determining [Fourteenth] Amendment violation is duration of the deprivation, and noting it must be for "a substantial period of time").

Again, the evidence does not establish that Saidock was *regularly* deprived use of CTU transport (i.e., a toilet). Quite frankly, the record provides no context whatsoever regarding how long the transport rides were (i.e., how long Saidock was without a toilet), or how many times he forced to ride in vehicles without toilets (i.e., non-CTU vehicles).[12] Moreover, there is no

---

[12] Only in one of the grievance forms does Saidock indicate that he was "stuck for over [an] hour on the marshal truck" without access to a toilet and forced to have liquid stool leak out on himself on his way to his court proceeding. Pl. Ex. 16, Doc. No. 101-3. That claim was not made under the penalty of perjury. Even if it was, however, it still would not establish a constitutional violation. *See Borges v. Boelter*, 2021 WL 2592849, at *2 (E.D. Wis. June 24, 2021) (noting that, the prisoner defecated in his pants and spent about an hour in soiled clothing, but still could not satisfy the objective prong); *see also Whitted v. Lazerson*, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (finding that the inmate failed to establish an objective injury where he was forced to wait one and a half

evidence that the temporary lack of access to toilets placed him at a substantial risk of serious harm, nor is there evidence that he actually suffered any physical injury. When pressed at oral argument, counsel for Saidock also could not point to any such evidence in the record.

Absent such evidence, no constitutional deprivation could have occurred. *See Whitted v. Lazerson*, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) ("The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation."); *see also Gill v. Riddick*, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) ("[The inmate] has not alleged any injury to his health as a result of being forced to hold his urine and any discomfort he experienced lasted only seventy minutes, at most. No matter how humiliating urinating on oneself can be, … [the inmate] has failed to prove the objective component....").

Since Saidock cannot establish that the Defendants' conduct "deprived [him] of rights, privileges, or immunities secured by the Constitution or laws of the United States," he cannot state a Section 1983 claim as a matter of law. *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).[13] Therefore, the Defendants' are entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment, doc. no. 38, is **granted**. Saidock's claims are dismissed with prejudice. The Clerk is directed to enter judgment in favor of the Defendants and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2022.

---

hours to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing").

[13]    It is unnecessary to reach the subjective prong because "without a constitutional violation, the Defendants clearly could not have acted with deliberate indifference." *Gill v. Riddick,* 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) (cleaned up). Similarly, I do not reach the Defendants' qualified immunity argument.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge